Hollis L. BURCH, Plaintiff,

v.

Eugene B. RAME and Glynn County Board of Commissioners, Defendants.

Civ. A. No. 287–119.

United States District Court, S.D. Georgia, Brunswick Division.

Jan. 11, 1988.

Edward E. Boshears, Brunswick, Ga., for plaintiff.

Terry L. Readdick, Brunswick, Ga., for defendants.

## ORDER

ALAIMO, Chief Judge.

Plaintiff, Hollis L. Burch, alleges violations of his constitutional due process rights arising from his suspension without pay and subsequent resignation from the Glynn County Police Department. Defendants, former Police Chief Eugene Rame and the Glynn County Board of Commissioners, move for summary judgment. Defendants contend that the uncontroverted facts establish that the suspension procedure in question comports with due process and that Burch voluntarily resigned, thus waiving the need for follow-up procedures. Because there are no issues of material fact, summary judgment is proper and will be granted in favor of the defendants.

## FACTS

Resolution of this case requires a rather detailed factual background. Lt. Hollis Burch was a 16–year veteran of the Glynn County Police Department. While on duty on January 11, 1985, Burch fired at a vehicle during a high-speed pursuit. In his written report filed that day, he wrote that he fired "5 times at vehicle tire." Three days later, as part of an Internal Affairs investigation regarding the incident, Burch stated that he fired four or five shots. On December 16 and 17, 1986, while testifying under oath in an unrelated civil action, Burch discussed the incident and repeated that he fired no more than five shots at the vehicle.[1]

After Burch testified, and after a jury verdict was entered for plaintiff in the case, the police discovered that Burch's statements and testimony were false. Burch's partner during the incident, Sgt. William Kempton, disclosed that Burch not only *emptied* his own gun at the vehicle, but that he also borrowed Kempton's revolver and fired *most* of its rounds at the vehicle. Kempton disclosed the information to Police Chief Rame on Friday, the 19th of December, 1986. On Sunday, Kempton went to Burch's home where Kempton told Burch about his conversation with Rame. The two discussed the incident and, in Burch's words, Kempton "refreshed my memory and reminded me that ... after I had emptied my revolver that I borrowed his and fired some shots out of it." Burch dep. at 5.

Rame confronted Burch with the information the next day, Monday, December 22. According to Burch, they met in Rame's office in the presence of two other officers to discuss the number of shots fired. Burch stated "[Rame] accused me of committing perjury in Federal Court and he made the statements that some heads was going to roll." Burch dep. at 6. Burch recollects that Rame said that all of the involved officers would again have to give their statements regarding the incident and that they would have to submit to polygraphs.[2]

---

1. The deposition of Eugene Rame clarifies that there were two civil actions involving the police department pending in December 1986. The "Pickens Case" arose out of the shoot-out and subsequent police conduct described above. Discovery in that case was still proceeding, an aspect of which was a stipulation that the police officers involved in the incident would submit to polygraphs if Pickens would also submit.

   The "Taylor Case" arose out of an unrelated incident. Because the plaintiffs in *Taylor* were attempting to establish a pattern of excessive force used by the department, evidence regarding the Pickens incident was developed at trial. It was during the trial of the *Taylor* case that Burch gave allegedly perjurious testimony. That trial concluded with a verdict for plaintiff (Taylor) on Thursday, December 18. It was while discussing that verdict that another police officer disclosed information to Rame which indicated that Burch's prior statements and testimony concerning the Pickens incident were false. Subsequently, the Pickens case settled.

2. Rame and Burch have different recollections of this encounter. Rame stated that he informed Burch that he believed Burch *may* have committed perjury, but that a transcript would have to be obtained to be certain. Rame also stated that he said the officers *might* have to submit to polygraphs, but that the issue was not yet resolved. Finally, Rame stated that Burch readily admitted at that time to using Kempton's gun. Rame dep. at 10–11.

   Although Burch has not denied using Kempton's revolver, Burch denied Defendants' Statement of Facts, ¶ 6, which states:

   At the meeting between Rame and the officers involved in the Pickens case, Burch ad-

Burch was off duty from December 23 through December 31 for previously scheduled leave. Before he returned to work, Burch was given written notification on December 31 that he was suspended without pay pending the adjudication of certain charges. The notification was hand-delivered by Assistant Chief of Police Peeples to Burch at Burch's home, and states in part:

SUBJ: Notification of Suspension Pending Adjudication of Charges/Allegations, Internal Affairs Investigation 85–026.

In accordance with the above internal and criminal investigations, you are hereby advised that, effective immediately, you are suspended without pay for a period of ten working days pending the adjudication of the following charge and specification and possible criminal charge of perjury.

*CHARGE:* Violation of the Glynn County Personal Management System Personnel Policies, Section 16, entitled, Reasons for Disciplinary Action, TO WIT: Item 7, "Wilfully giving false statements to supervisors, officials, or the public."

The specifications recited the written report of January 11, 1985; the Internal Affairs interview of January 14; and the then-recent federal court testimony. The notification also informed Burch that he had the right to appeal the suspension.

The notification was made in accordance with a County policy which states:

*Section 8: Suspension During Investigation of Charges*

When an employee has acted or is alleged to have acted in a manner which would subject him to dismissal from the County service, he may be suspended by his Department Head for a period not in excess of ten days while the Department Head and Personnel Director investigate the charges before making a final determination as to whether the employee should be dismissed from the County service. An employee who is exonerated of charges following investigation shall be reinstated without loss of pay, privileges, benefits, or status.

Because the suspension was effective immediately, Burch was not given an opportunity to respond to the *written* charges against him before the sanction was imposed. This is the basis for Burch's first alleged constitutional deprivation.

The allegations of additional constitutional deprivations focus on the events following the suspension. While Peeples remained at Burch's home after delivering the notification, Burch contacted an attorney, George Rountree. Rountree advised Burch to sign the notification acknowledging receipt and to request any supporting documents regarding the charges. Burch did both. Later that day, Burch went to Rountree's office to discuss the situation. While there, Rountree phoned the County Attorney, Tom Lee, and discussed Burch's status. According to Burch, Rountree talked for a short while to Lee and then repeated to Burch: "They said if I would resign that they would not prosecute me for perjury." Burch dep. at 15. The substance of the conversation, although not the date, is confirmed by Rountree's affidavit:

As I recall it, Mr. Lee indicated in these conversations that, unless Hollis Burch resigned, the County felt it would have to make this information known to the United States District Court for the

---

mitted that he did use Sgt. Kempton's gun and stated that he was not quite positive of what his testimony was in federal court.
While the Court accepts Burch's version of the meeting (as the non-movant), the Court also finds that Burch's testimony establishes that he *used* Kempton's revolver and that his various reportings of the incident were erroneous. *See* Burch dep. at 5 (quoted in text, *supra*); *id.* at 15–16:

And I think I told [my attorney] that since Kempton had refreshed my memory ... that when I went back into court on the Pickens

case I would have to correct my testimony, and that the fact that my testimony was faulty would come out then. And [my attorney] told me that they were trying to settle the Pickens case out of court and that if they did then Judge Alaimo would not know that I had committed perjury.
As will be discussed, *infra,* whether or not Burch admitted to using Kempton's revolver at that meeting, as well as the other discrepancies noted, are not material issues to the resolution of this case.

Southern District of Georgia and, more particularly, Judge Alaimo [the presiding judge in the Pickens case], because it appeared to them that Hollis Burch had perjured himself during the trial. During our conversations, I secured a promise from Mr. Lee that, if Hollis Burch did resign, the aforesaid information would not be passed along ... and that no further action would be taken against Officer Burch.

Affidavit of George M. Rountree.

On January 7, 1987, Burch received notice of a hearing scheduled for January 9 which states, in part:

SUBJ: Due Process Hearing

A departmental hearing will be held ... to review evidence and testimony regarding the charge of willfully giving false statements to supervisors, officials or the public....

The purpose of this hearing will be to determine whether sufficient grounds for your dismissal from the Glynn County Police Department exists.

The notice informed Burch of his right to be present and to be represented by counsel; that the Hearing Board would consist of three police officers (two majors and a captain); that two other officers would present evidence on behalf of the County; and that Kempton would testify. The members of the Board were selected by Rame, who stated that they were selected on the basis of having ranks superior to Burch. Burch has not refuted that justification, nor made any allegations questioning the impartiality of the Board.

The next day, January 8, Burch, along with his attorney, requested that the hearing be postponed while Burch pursued the possibility of a transfer to another County position. Burch stated that he contacted the County Administrator, Charles Stewart, in an effort to secure a transfer. Stewart expressed interest in Burch's abilities as a heavy equipment operator but concluded by stating that nothing could be done while Burch was on suspension from the police department. Burch then went to Rame's office, where:

I told [Rame] that I had two weeks vacation coming and I made him an offer that I told him that I would take the ten days suspension and not appeal it and take my two weeks vacation to see if I could get a transfer, and he thought about it a minute, for a few seconds, and he said, no, he couldn't do that because there was some other people involved in the thing that may also have to be terminated.

Burch dep. at 18.

Burch also contacted his attorney on that day, who repeated the County Attorney's assurances that if Burch resigned the County would not pursue the perjury charge. Additionally, Rountree delivered to Rame an acknowledgment dated January 8, regarding the postponement of the hearing. On the bottom of the letter Rountree wrote, in his handwriting: "P.S.—This is just to Protect the record. I don't think we'll ever really have a hearing." The hearing was rescheduled for Monday, January 12.

Burch, however, resigned on that day and the hearing was never held. Burch delivered his resignation to Rame's office on Monday morning. He made his resignation effective on January 26, stating that he wanted to comply with the County's two-week notice requirement to insure that he would not lose vested leave time. Burch was willing to take his accrued leave for the two weeks' interim.

Rame rejected the resignation, contending that Burch could not take leave while he was on suspension. Rame offered to waive the two-week notice requirement and asked Burch to make his resignation effective immediately. According to Burch, Rame redrafted Burch's resignation, making it effective immediately, and drafted a memo purporting to waive the two-week notice requirement. Burch doubted Rame's authority to waive the County's requirement, stating:

I wouldn't sign it and he got a little irritated and he threw his pencil down on the desk and he said, "Well, if you don't sign it," he said, "we'll go ahead and have the hearing and fire you anyway." And I told him, I said, "Well, Chief, I

don't think you have the authority to waive something in the personnel manual." He thought about it a minute and he said, "Well, maybe you're right."

Burch dep. at 21.

Later that day, relying on Rame's assurances and a memo signed by Charles Stewart, the County Administrator, waiving the two-week notice, Burch signed the redrafted version of his resignation, which was effective immediately, on January 12, 1987. As per the waiver, Burch was credited and paid for the accumulated leave time.

Burch now contends that the resignation was coerced. His arguments focus on statements made by Rame; the conversations between the County Attorney and his own attorney regarding the perjury allegations; and Burch's misunderstandings regarding the consequences to his insurance and pension benefits resulting from the alternatives of voluntary resignation versus termination for cause. Regarding the last issue, the following exchange took place:

Q Is it a fair statement that you inquired or asked various people in the county what effect termination would have on your insurance and your pension benefits as opposed to what effect voluntary resignation would have on those benefits?

A No, sir. I was under the impression—in fact, I had this discussion with Chief and I told him, I said,—When I asked him if he wanted my resignation and he told me, he said, "Well, that would be better than getting fired." I said, "Well, you're probably right because if I got terminated," I said, "I would lose my insurance benefits and my pension." I recall that in this discussion that that was said, in one of the discussions I had with [Chief Rame].

Q He said that or you said that?

A I said that.

Burch dep. at 41–42.

Burch also alleges a coercive atmosphere arising from his personal situation. His wife was scheduled to undergo surgery requiring hospitalization. Because Burch was relying on the insurance coverage arising from his County employment, he was concerned that he do nothing to jeopardize his coverage. He has made no allegations that the defendants were aware of this.

Defendants argue that Burch's *own* testimony establishes that his resignation was voluntary. They list a number of facts which Burch does not dispute:

13. Because of a conversation with his attorney, George Rountree, Lt. Burch was under the impression that any potential perjury charges would not be pursued if he resigned.

14. No one, including Burch's attorney or anyone from Glynn County, ever told Burch that criminal charges for perjury would be brought against him if he went through with the departmental hearing.

15. At the time of his resignation, Lt. Burch was under the impression that he would lose his pension benefits and his medical insurance benefits if he were involuntarily terminated. He obtained this impression because of a general letter he had received from the personnel department on December 17, 1986, stating that county employees would lose insurance benefits if they were terminated for cause.

16. *After* Burch resigned, he determined that an involuntary termination would not have affected his pension benefits, although it would have affected his insurance benefits, as stated in the letter he received.

17. *Before* Burch resigned, he never asked anyone whether or not his pension benefits would have been affected by involuntary termination.

Defendants' Statement of Material Facts (citations to Burch's deposition omitted).

Burch also testified that his attorney advised him to resign:

Q Did you prior to resigning obtain advice from an attorney—Well, let me say specifically from George Rountree, as to whether or not you should resign?

A Yeah. He told, he suggested that I resign.

Burch dep. at 45.

Burch alleges distinct, yet intertwined, constitutional violations. First, he argues

that his ten-day suspension without pay was imposed without a prior hearing and thus violated procedural due process. Second, he argues that both procedural and substantive due process were violated when he was "coerced" into resigning rather than pursuing his right to remain in the police force.

**DISCUSSION**

Summary judgment is proper if the parties' submissions "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The movant is entitled to judgment as a matter of law when the non-moving party fails to make a sufficient showing of an essential element of the case on which the non-moving party has the burden of proof. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The evidence of the non-movant is treated as true, and all reasonable inferences are to be made in the non-movant's favor. *Adickes v. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). However, an inference based on speculation and conjecture is not reasonable and need not be made by the Court. *Blackston v. Shook & Fletcher Insulation Co.,* 764 F.2d 1480, 1482 (11th Cir.1985).

To prevail in his civil rights action, 42 U.S.C. § 1983, Burch must establish that the defendants deprived him of a constitutional right and that their actions were taken under color of state law. *Motes v. Myers,* 810 F.2d 1055, 1058 (11th Cir.1987).

It is undisputed that the actions of the defendants were taken under color of state law; however, it is also apparent that Burch has failed to establish any constitutional deprivations.

**(A) Suspension Without Pay**

There appear to be no cases dealing with the specific situation of a brief and finite suspension without pay imposed under the County policy utilized here and the facts of this case. However, after closely reviewing similar cases and applying the undisputed facts, the Court finds that a legitimate property interest was implicated

and that due process required a minimal opportunity to be heard before the sanction was imposed. However, the Court also finds that, under the facts presented here, the meeting between Rame and Burch on December 22 satisfied the necessary pre-suspension procedural requirements.

The Due Process Clause of the Fourteenth Amendment prohibits the deprivation of life, liberty or property without due process of law. U.S. Const. amend XIV, § 1. While the process due is a question of federal law, *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 541, 105 S.Ct. 1487, 1492–93, 84 L.Ed.2d 494, 503 (1985), the parameters of a property interest—the "rules or understandings that secure certain benefits and that support claims of entitlement"—are typically state law issues. *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed. 2d 548, 561 (1972).

It is accepted that Georgia has created a protected property interest in continued employment for public employees who can be terminated only for cause. *See Brownlee v. Williams,* 233 Ga. 548, 551, 212 S.E. 2d 359 (1975); *Hatcher v. Board of Public Education & Orphanage,* 809 F.2d 1546 (11th Cir.1987); *Barnett v. Housing Authority,* 707 F.2d 1571, 1576–77 (11th Cir. 1983). It is less clear whether Georgia has created a similar entitlement dealing with a ten-day suspension without pay. Nevertheless, this Court determines that ten days of work and income constitutes a limited property interest which the Court is unwilling to characterize as *de minimis. See Barry v. Barchi,* 443 U.S. 55, 64, 99 S.Ct. 2642, 2649, 61 L.Ed.2d 365, 375 (1979) (racehorse trainer's 15–day suspension constitutes a limited property interest); *cf. Hardiman v. Jefferson County Board of Education,* 709 F.2d 635, 637–38 (11th Cir.1983) (a teacher's 90–day suspension with pay may have implicated a property interest but that interest, if any, would be *de minimis,* warranting no procedural protections).

Consequently, the Court must determine what procedural requirements are necessary before the governmental employer can

deprive the employee of this admittedly limited property interest.

The fundamental precepts of due process are notice and the opportunity to be heard. *Mullane v. Central Hanover Bank & Trust Company,* 339 U.S. 306, 313, 70 S.Ct. 652, 656–57, 94 L.Ed. 865, 873 (1950), and it is often stated that due process is a fluid concept:

> [T]he standards of procedural due process are not wooden absolutes. The sufficiency of procedures employed in any particular situation must be judged in the light of the parties, the subject matter and the circumstances involved.

*Hatcher, supra* at 1553 n. 17, *quoting Ferguson v. Thomas,* 430 F.2d 852, 856 (5th Cir.1970).

In the governmental employee context, the Court in *Loudermill* stated that due process requires:

> a balancing of the competing interests at stake. These are the private interest in retaining employment, the governmental interest in the expeditious removal of unsatisfactory employees and the avoidance of administrative burdens, and the risk of an erroneous termination.

*Loudermill, supra* at 542–43, 105 S.Ct. at 1494.

■ Although due process is not wooden, it is now fully accepted that a public employee is entitled to notice and an opportunity to be heard *prior to termination.* The hearing need not be a full evidentiary hearing; rather, due process is satisfied if there is some minimal pretermination hearing followed with a more expansive post-termination procedure. *Id.* at 545, 105 S.Ct. at 1495.

It is less clear whether due process requires a hearing prior to a finite suspension without pay. *Barry v. Barchi, supra,* supports the contention that a presuspension hearing is unnecessary. In *Barchi,* the Court upheld a provision for a trainer's 15–day suspension without requiring a prior hearing. At issue was a New York statute which attempted to control the drugging of racehorses. After a race, if the horse's urinalysis tested positive for controlled narcotics, the Racing Commis-sion could automatically suspend the horse's trainer for 15 days. The statute created a presumption that the trainer either intentionally drugged the horse or was negligent in failing to prevent the drugging. After finding a limited property interest in the loss of the right to work for the finite period (enhanced by liberty—*i.e.,* reputational—interests), the Court ruled that the post-deprivation appeals process could adequately provide the trainer with procedural due process. The Court cited the factors of the highly regulated nature of the horse-racing industry and the potential for public danger arising from tampered races for upholding the procedure. It is also noted that, essentially, the Court was asked to uphold the statutory presumption of cause that could only arise after clear, scientific analysis established that drugging took place.

The later, and more expansive, case of *Loudermill* cites *Barchi* with approval, 470 U.S. at 542, 105 S.Ct. at 1493, and suggests that finite suspension cases and termination cases may be treated differently.

On the authority of *Barchi,* lower courts have regularly upheld the suspension of physician privileges at public hospitals without requiring presuspension hearings, by holding that the clear and detailed post-deprivation procedures provided due process. *See, e.g., Richards v. Emanuel County Hospital Authority,* 603 F.Supp. 81, 84 (S.D.Ga.1984) (and cases cited therein).

As well, in *Hatcher, supra,* the Eleventh Circuit did not require a prior hearing regarding the "constructive demotion" to a library position of a principal whose school was closed down. There, the court focused on whether a protected interest existed and, after finding an entitlement, ruled that post-deprivation hearings would be adequate. The court stressed that the administrative burdens and delays inherent in hearing many individual educators' arguments regarding assignments before deciding to close a particular school would have been substantial. *Hatcher,* 809 F.2d at 1553.

In support of plaintiff's contentions, there are cases holding that a presuspension hearing is required if the suspension is without pay. In *Loudermill*, Justice White stated *in dicta:*

> Finally, in those situations where the employer perceives a significant hazard in keeping the employee on the job, it can avoid the problem by suspending him *with* pay.

470 U.S. at 544–45, 105 S.Ct. at 1495 (emphasis added).

Relying on this comment, the Eleventh Circuit recently held that a suspension without pay required a presuspension hearing. *Everett v. Napper*, 833 F.2d 1507 (11th Cir.1987). In *Napper*, the fire department was investigating the use of drugs by its personnel. When the plaintiff refused to submit to a urinalysis, he was suspended without pay. He had a hearing two months later, at which time he was terminated. The court upheld his termination but stated that the suspension violated due process. The court focused its discussion on the Fourth Amendment issue involved there and did not discuss the actual suspension procedure applicable in the case. The entire discussion of the suspension is set out below.[3]

In *Glenn v. Newman*, 614 F.2d 467 (5th Cir.1980), the court ruled that a police officer's suspension without pay, which was imposed without a prior hearing, violated due process. As in *Everett*, the plaintiff was provided with a subsequent hearing, at which time he was terminated. The court upheld the termination and, without discussion, concluded:

> Because any claim of pretermination due process violations was cured by the subsequent due process hearing, the only damages to which Glenn is entitled ac-

crued during the period between his dismissal and the date of his post-termination hearing. We therefore remand for an assessment of backpay due for [that] period....

*Id.* at 473.

Elsewhere in *Glenn v. Newman*, the court relied on *Thurston v. Dekle*, 531 F.2d 1264 (5th Cir.1976), *vacated on other grounds*, 438 U.S. 901, 98 S.Ct. 3118, 57 L.Ed.2d 1144 (1978), *relevant portions reinstated*, 578 F.2d 1167 (5th Cir.1978). In *Thurston*, an employee was suspended without pay for 30 days pursuant to a policy where her suspension automatically became a termination absent her successful appeal to the review board. The court treated the suspension as a termination, stating:

> The City argues that its employees may seek review of their suspension without pay. During this period of the suspension without pay, however, the employees lose all benefits of employment. In addition, the suspension automatically becomes termination unless the Civil Service Board on review orders reinstatement and backpay. The lower court correctly saw this suspension process as no more than a facade. It held that "in reality, 'suspension' under the present state of facts ... is in the functional equivalent of *permanent discharge* subject to the condition subsequent that an employee may be reinstated with backpay upon successful appeal." Since suspension without pay is in reality termination, the city must provide whatever pretermination procedures the Constitution mandates prior to suspension without pay.

---

**3.** Everett also argues that his suspension without pay from August 4, 1984, to October 3, 1984, the date of the first full hearing, violated his due process rights. We acknowledge that "where the employer perceives a significant hazard in keeping the employee on the job," the employer may suspend the employee *with* pay even before granting an opportunity to be heard or notice. [Citing *Loudermill*.] Since Everett's pay was stopped, however, a hearing was required. The only arguable hearing prior to the suspension

without pay was the confrontation between Everett and Lathrop [the investigator from the Office of Professional Standards who ordered Everett to submit to a urinalysis]. Drawing all inferences in favor of Everett, we cannot say that the confrontation provided adequate notice and hearing. We, therefore, must reverse the grant of summary judgment with respect to the suspension without pay issue.
*Everett v. Napper*, 833 F.2d 1507, 1512 (11th Cir.1987) (emphasis in original).

578 F.2d at 1272 (emphasis in original); *see also Hardiman, supra,* 709 F.2d at 637 n. 1 ("[Plaintiff] had a due process property interest in his position.... Thus, absent an 'extraordinary situation,' Hardiman would have been entitled to some form of hearing prior to being suspended without pay."), *citing Thurston.*

■ The procedure used in the instant case was not the functional equivalent of a termination,[4] and it appears to the Court that the brief and finite nature of the suspension imposed here distinguishes it from each of the cases described above. However, upon a "balancing of the competing interests at stake," *Loudermill, supra* 470 U.S. at 542, 105 S.Ct. at 1494, the Court finds that due process requires a presuspension opportunity to be heard whenever the instant provision is invoked by the County.

It is significant that the provision is designed specifically to suspend an employee pending investigation of charges which warrant dismissal. Because such charges can be made *ex parte,* it is only reasonable that the employee be able to respond to those charges before *any* adverse action is taken. Such an opportunity benefits both the employer and the employee because it greatly diminishes the chances of an erroneous sanction. As well, a minimal opportunity to respond to the charges will not significantly burden the employer. Unlike the situation in *Hatcher,* only individual application of the provision is anticipated. Thus, it is unlikely that requiring a department head to confront an employee accused of serious misconduct *before* that accusation causes loss of pay will seriously burden or hamper the workings of local government.

■ Like pretermination hearings, this opportunity need not encompass the elements of an adversary proceeding. Rather, it must serve the limited purpose of insuring that the employer does not act upon *ex parte* charges without some opportunity for the employee to respond to those charges. Because the affected property interest is significantly less than a termination interest, it follows that even the pretermination right to respond in writing to the charges is unnecessary. An opportunity to respond orally to the charges before *any* action is taken, coupled with a more formalistic post-suspension hearing, provides the employee with due process.

In this case, Burch had that presuspension opportunity to challenge the charges at the meeting with Rame on December 22. Although Burch and Rame disagree as to some of the details of the meeting, the important facts are not disputed. Both agree that new information led the police department to believe that Burch lied about the number of shots fired during the Pickens incident. Burch was made fully aware that the basis for that belief was Sgt. Kempton's disclosure. Furthermore, Burch was made aware of the consequences of that disclosure; in his own words, Rame accused him of committing perjury and told him that "heads [would] roll."

The charges discussed in Rame's office at that time were the only charges listed on the suspension notice. The only change between the meeting and the notification

---

**4.** The Glynn County policy involved here is significantly different from the Jacksonville policy at issue in *Thurston.* Here, Burch was suspended pursuant to ¶ 8 of the County's policy which allowed for suspension *only* for the specific purpose of investigating charges "which would subject [the employee] to dismissal." The provision allowed only a finite ten-day suspension which is much shorter than the 30–day suspension used in Jacksonville. More significantly, the suspension here required the County, not the employee, to act before the suspension became a termination and gave the County just those ten days in which to do so. Rather than automatically becoming a termination, a reasonable reading of the provision allows for various results once the suspension is imposed. Upon investigation of the charges, the County can find that the charges are unwarranted, thus mandating that the employee "be reinstated without loss of pay, privileges, benefits, or status." Alternatively, if the charges can be substantiated, further action would be warranted by the County. Presumably, that action can consist of *any* disciplinary action up to, and including, termination.

Consequently, Burch's suspension, albeit without pay, was not the functional equivalent of a termination.

was that it actually suspended Burch while those charges were *fully* investigated. At the point he received the written charges, it was unnecessary to provide Burch with another opportunity to respond. The post-suspension hearing—the notification of which informed Burch of details of the Board's composition, the witnesses to be called and Burch's rights to be present and have counsel—adequately insured that due process would be guaranteed.

While there is no question that Burch was not given a chance to respond in writing once the charges were reduced to writing, that opportunity would be meaningless under these facts. Had the suspension been imposed, based on Kempton's disclosure, without Burch knowing the basis of the charges and without an opportunity to respond, the situation would be very different. In such a scenario, the potential for an erroneous deprivation, regardless of its extent, would be manifest. But that situation is not before the Court. Requiring a second opportunity to respond once the charges were in writing would appear to constitute rigid adherence to wooden absolutes, which this Circuit aptly decries.

Under the facts of this case, and considering the finite and limited nature of the suspension imposed, the Court determines that Burch was provided with procedural due process.

### (B) Voluntariness of Burch's Resignation

■ Burch contends that his resignation was coerced and thus violated both procedural and substantive due process. As noted above, an aspect of procedural due process was Burch's right to a thorough post-suspension hearing which Burch admittedly never had because he resigned instead. While a voluntary resignation would serve

to waive that procedural right, *Van Arsdel v. Texas A & M University*, 628 F.2d 344 (5th Cir.1980), it is axiomatic that a coerced resignation will not act as a waiver. A waiver through resignation is only effective if it is both knowingly and voluntarily made. *Id.* In *Van Arsdel*, a university professor resigned after a woman lodged a sexual harassment complaint against him. The departmental head informed Van Arsdel of the charges and the likelihood that the university would institute a dismissal proceeding if he did not resign. Van Arsdel chose to resign, and some months later attempted to rescind his resignation. The university refused and Van Arsdel sued. The district court found duress and issued a reinstatement injunction. The circuit court reversed, finding no duress as a matter of law.

A substantive violation exists when "governmental actions 'offend those canons of decency and fairness which express the notions of justice of English-speaking peoples,'" *Everett, supra* at 1513, *quoting Rochin v. California*, 342 U.S. 165, 96 L.Ed. 183 (1952); or when the "deprivation of a property interest [results from] an improper motive and [is] by means that were pretextual, arbitrary and capricious, and ... without any rational basis." *Hearn v. City of Gainesville*, 688 F.2d 1328, 1332 (11th Cir.1983).

Burch was faced with the choices of resignation or termination for cause based on the charge that he willfully misled his supervisors and the public.[5] There can be no merit to the argument that it is arbitrary or capricious to terminate a county employee for lying about facts pertinent to his duties. The facts of this case highlight the disruption that such misinformation can produce.

---

5. The Court notes that, at the time Burch resigned, he was faced only with the *possibility* of termination for cause. Although Burch was convinced that he would be terminated, Burch dep. at 39 ("there was no doubt in my mind that I was going to be fired"), he has made no allegations that the Hearing Board, which did not include Rame, was biased. While his belief is subjective, and thus not necessarily a basis for alleging duress, *Christie v. United States*, 518 F.2d 584, 587 (Ct.Cl.1975), the Court accepts Burch's formulation of the issue. However, the cases indicate that the difference between *possible* termination and *certain* termination is of no consequence. *Compare Christie* (resignation submitted after final decision to terminate but before termination's effective date) *with Van Arsdel* (resignation submitted after initial charges were filed by co-employee but before *any* dismissal proceedings were instituted).

Admittedly, Burch was faced with two unpleasant choices. However, duress is not present "whenever a party is confronted with a dilemma." *Van Arsdel, supra* at 346. As the court points out, when an employer has the right to commence dismissal proceedings, "choosing to obviate the embarrassment that a public, detailed dismissal proceeding would bring" can be a "reasoned choice" by the employee. *Van Arsdel, supra* at 346.

*Christie v. United States*, 518 F.2d 584 (Ct.Cl.1975), provides a framework for analyzing whether that choice is reasoned or coerced. There, the court stated that duress exists if:

> one side involuntarily accepted the terms of another; (2) that circumstances permitted no other alternative; and (3) that said circumstances were the result of coercive acts of the opposite party.

*Id.* at 587, *quoting Fruhauf Southwest Garment Company v. United States*, 111 F.Supp. 945, 951 (Ct.Cl.1953). In *Christie*, a civilian naval employee resigned after charges were lodged against her that she struck her supervisor. The employer decided to terminate her, but then allowed her to resign under a planned reduction in force. Although Christie insisted that her resignation was under duress at the time she submitted it, the court held that the objective factors surrounding her choice established that her resignation was voluntary. In addition to reviewing her allegations under the framework cited above, the court reiterated that a resignation is presumed to be voluntary, *Christie, supra* at 587, and that the test is an objective one and "not measured by the employee's subjective evaluation of the situation." *Id.*

■ The facts here establish that Burch's resignation was not the result of duress and was knowingly and voluntarily made. At the outset, a significant fact is that Burch contacted an attorney before *any* discussions of resignation took place and that, ultimately, the attorney advised Burch to resign.

Burch's contention that his resignation was not "knowingly made" because of his misunderstandings as to the consequences to his pension misses the mark. "Knowingly" refers to appreciating the availability of the Constitutional alternatives—the right to a hearing—not to relying on the County to outline all of the consequences of the available alternatives. His allegation of misrepresentation—based on Rame's silence when *Burch* mentioned the adverse consequences to his pension if terminated—similarly fails. An omission constitutes a misrepresentation only when (1) the party is under a duty to disclose the information; (2) it is established that the party knew the truth and (3) that the party intended that the injured party rely on the silence. *See generally*, 37 Am.Jur.2d, *Fraud and Deceit* § 145. First, Rame's duty extended no further than informing Burch of his right to a hearing. As stated, he had no duty to inform Burch of *all* of the consequences of that decision. Further, Burch makes no allegation that Rame actually *knew* of the consequences to pensions and insurance benefits resulting from the alternatives of termination or resignation.

Finally, Burch's contention that his personal situation regarding his wife's imminent hospitalization created a coercive atmosphere has no relevance here. That situation was not the result of any conduct by the defendant, nor has Burch alleged that the defendants were even aware of this fact.

Burch's major contention is that the County's promise not to pursue the perjury allegations in return for his resignation violated public policy and constituted actions which "offend the notions of justice." The recent decision in *Town of Newton v. Rumery*, — U.S. ——, 107 S.Ct. 1187, 94 L.Ed.2d 405 (1987), supports this Court's finding that this promise does not rise to that level of proscribed governmental conduct. In *Newton*, Rumery was arrested, on sketchy evidence, for tampering with a witness—a felony under New Hampshire law. Rumery, through his attorney, advised the prosecutor that "he had better [dismiss] these charges, because we're going to win them and after that we're going to sue." —— U.S. at ——, 107 S.Ct. at

1191, 94 L.Ed.2d at 414. The prosecutor and Rumery entered into an agreement in which the prosecutor dismissed the charges in return for Rumery's promise not to sue. The First Circuit refused to enforce the agreement when Rumery subsequently instituted a § 1983 action stating:

> Enforcement of such covenants would tempt prosecutors to trump up charges in reaction to a defendant's civil rights claim, suppress evidence of police misconduct, and leave unremedied deprivations of constitutional rights.

— U.S. ——, 107 S.Ct. at 1191, *Id.* at 415, *quoting* 778 F.2d 66, 69 (1st Cir.1985).

The Supreme Court reversed. The Court rejected a *per se* rule of rejecting such release-dismissal agreements stating:

> In many cases a defendant's choice to enter into a release-dismissal agreement will reflect a highly rational judgment that the certain benefits of escaping criminal prosecution exceed the speculative benefits of prevailing in a civil action. Rumery's voluntary decision to enter this agreement exemplifies such a judgment. Rumery is a sophisticated businessman. He was not in jail and was represented by an experienced criminal lawyer, who drafted the agreement. Rumery considered the agreement for three days before signing it. The benefits of the agreement to Rumery are obvious: he gained immunity from criminal prosecution in consideration of abandoning a civil suit that he may well have lost.

— U.S. at ——, 107 S.Ct. at 1193, *Id.* at 416–17.

Of course, the situation in *Rumery* is not controlling on these facts. However, the lessons and language are persuasive. If the agreement to drop criminal charges which actually exist does not violate public policy, surely the agreement not to pursue them by one without the authority to institute charges will not violate public policy.

Turning to the instant case, the Court notes, initially, that a fair reading of the record indicates that the promise not to pursue the perjury investigation was *solicited* by Burch and his counsel, rather than offered by the County Attorney, Tom Lee. *See* Burch's and Rountree's statements quoted *supra* at pp. 1219–1220 n. 2 and p. 1220, respectively. However, assuming that the offer was made initially on behalf of the defendants, it does not violate public policy.

Burch's statements make clear that there never was a *threat* to institute the criminal process if Burch did not resign; rather, there was the more benign understanding that no further action would be taken if Burch *did* resign. There was no promise to "cover up" or hamper an existing criminal investigation; and because the case terminated with a plaintiff's verdict, it appears that there was no absolute duty on behalf of the defendants to disclose the information to the Court.

**CONCLUSION**

The undisputed facts of this case fail to establish that any constitutional deprivations took place. Accordingly, summary judgment is proper and is hereby GRANTED. The Clerk of the Court is directed to enter judgment in favor of defendants Eugene Rame and the Glynn County Board of Commissioners and against plaintiff.